# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 14, 2012

## STATE OF TENNESSEE v. JAMEY RAY CHRISTY

**Appeal from the Circuit Court for Montgomery County**
**No. 40901085      Michael R. Jones, Judge**

---

**No. M2011-02221-CCA-R3-CD Filed - March 01, 2013**

---

The Defendant-Appellant, Jamey Ray Christy, was convicted by a Montgomery County jury of aggravated child neglect, a Class B felony; voluntary manslaughter, vehicular homicide, and aggravated assault, all class C felonies; and reckless endangerment with a deadly weapon involved, a Class E felony. The trial court merged the voluntary manslaughter and vehicular homicide convictions and imposed concurrent terms of eight years' confinement for the vehicular homicide and aggravated assault and three years' confinement for the reckless endangerment. The trial court imposed a consecutive term of ten years' confinement for the aggravated child neglect conviction, for an effective sentence of eighteen years. The sole issue presented for our review is whether the evidence was sufficient to support the conviction of aggravated child neglect. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

H. Reid Poland, III, for the Defendant-Appellant, Jamey Ray Christy.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Reid Poland, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On November 1, 2007, the Defendant-Appellant was driving his car with his eleven-year old son in the front-seat. While driving, the Defendant-Appellant attempted to stop the truck driven by his wife, Elizabeth Christy, and chased her for eleven miles. During the chase, the Defendant-Appellant struck his wife's truck several times, causing the truck to

crash. Ms. Christy was killed and David Gibson, a passenger in her truck, was seriously injured. The Defendant-Appellant was later indicted for vehicular homicide and first degree murder of his wife, Elizabeth Christy; aggravated assault against David Gibson, by use of the car as a deadly weapon; aggravated child neglect against his eleven-year-old son by the use of his car as a deadly weapon; and reckless conduct with a deadly weapon placing others in imminent danger of death or serious bodily injury. The following proof, in pertinent part, was adduced at trial.

On the day of the offense, Ms. Christy attended an adult wedding reception at a cabin in the woods without the Defendant-Appellant. David Gibson, a friend of Ms. Christy's, testified that he left the party with Ms. Christy to get "some drinks," and she volunteered to drive. Gibson had previously narrated a video for the Tennessee Highway Patrol which depicted the path they took on the night of the offense. As they were driving down the gravel road, they encountered the Defendant-Appellant parked behind a logging trailer. As soon as Ms. Christy saw the Defendant-Appellant, she "went pale" and became as "white as a ghost." Gibson said he knew that she was scared.

Gibson said that the Defendant-Appellant and Ms. Christy "had words," and when Ms. Christy got back in her truck, she "floored it." Ms. Christy was unable to turn her truck around because the road was narrow and the Defendant-Appellant was behind them. Gibson tried to get Ms. Christy to pull into a nearby driveway, but Ms. Christy refused because she was trying to reach someone on the phone. Gibson said Ms. Christy turned left onto Dover Road and was driving "as fast as the truck [would] go" in an attempt to get away from the Defendant-Appellant. However, the Defendant-Appellant remained at least "thirty feet" behind them. Gibson called 911 for assistance and told them that the Defendant-Appellant was chasing them. During the 911 call and at trial, Gibson said that the Defendant-Appellant struck their car. After the Defendant-Appellant struck the truck a second time, it flipped. Both Gibson and Ms. Christy were ejected from the truck, and Ms. Christy died soon after impact. Gibson was airlifted to Vanderbilt Hospital with multiple fractured and broken bones.

On cross-examination, Gibson acknowledged that he smoked "a joint" of marijuana on the afternoon of the offense. He also agreed that he told the 911 operator that he was being chased by his girlfriend's husband.

J.C., who was fourteen at the time of the trial, testified that his father drove to the cabin on the night of the offense. J.C. stated that his father stopped the car to walk to the cabin because the road had become "rocks and gravel[.]" J.C. told his father to stay in the car, and eventually, they saw his "mother's car coming . . . and [the Defendant-Appellant] got out and went over to her car." J.C. said he then heard a door slam and saw his mother's truck take off. J.C. said his father got back into their car and followed her. J.C. testified that both vehicles were "going real fast" and that he was "scared." J.C. explained that "[he] just knew

something was going to happen."  J.C. observed his father's car strike his mother's truck "once and [it] started swerving, and then he hit [it] twice and the car flipped."  Asked if he tried to stop his father, J.C. said, "I told [the Defendant-Appellant] to stop a bunch of times, and it didn't work."  On cross-examination, J.C. said that he was "upset" after the crash.

Lead Critical Response Team Investigator Allan Brenneis testified as an accident re-constructionist.  He explained that the "left front end of [the Defendant-Appellant's] vehicle" hit Ms. Christy's "right rear quarter panel," causing her truck to "strike a curb" and flip.  At the point of impact, the minimum speed of the cars was "about 94 miles" per hour. Montgomery County Deputy Sheriff Carlos Silva was the first officer to arrive on the scene. He testified that when he got closer to the flipped vehicle in the road, he saw that it was on fire.  He saw Ms. Christy lying on the ground, while the Defendant-Appellant and his son walked towards him.  Deputy Daniel Brinkmeyer of the Montgomery County Sheriff's Office arrived on the scene shortly thereafter.  He saw Ms. Christy "laying [sic] in the road," bleeding profusely.

Douglas Allen Jones of Ft. Campbell Emergency Medical Services responded to the scene and observed Ms. Christy in "[v]ery critical" condition.  He testified that she had "[m]ajor head trauma [and] major trauma throughout the upper part of the body, blood coming out of ears, nose, mouth . . .[and] dying gasps."  He attempted life saving measures but was unable to resuscitate her.

Dr. Thomas Deering, an expert in forensic pathology, performed the autopsy on the victim and determined the cause of death to be  "[m]ultiple blunt force injuries," consistent with being ejected from a motor vehicle during a crash.  Based on the toxicology reports, Ms. Christy's blood alcohol content was 0.236, over three times the legal limit.  In addition, Dr. Deering testified that lab reports showed amounts of Tetrahydrocannabinol "THC" and "methadone," which indicated that Ms. Christy had used both marijuana and methadone on the day of the offense.  Dr. Deering testified that the Defendant-Appellant tested negative for alcohol and drugs.

Robert Anderson and Yancey Seymore witnessed the crash.  Anderson was driving on Dover Road that night and thought the two vehicles were "drag racing."  Anderson said "the outside car," the car driven by the Defendant-Appellant, "looked like it was trying to get around" the truck.  Anderson said the truck was "pinned in between the car and the curb." Anderson testified that the car "severely cut in [on the truck]" and clipped its front end. Anderson, a former stock car driver, opined that the car "intended on taking the [truck] out." Yancey Seymore was also driving on Dover Road that night and said that both cars "were going really fast."  She said the car was behind the truck and that the car was "weaving from lane to lane." She observed the car hit the truck and called 911.

Agent Mary Neely of the Tennessee Bureau of Investigation testified that on the night of the offense she interviewed the Defendant-Appellant because he was one of the individuals involved in the crash. She said the Defendant-Appellant was not in custody and that the interview occurred outside, near the back of one of the cars. The interview was audio-recorded, a transcript of which was provided for the jury at trial. Within the statement, the Defendant-Appellant explained, in pertinent part, the following:

I actually left from my house to go check on my wife and when I got there, she was in the middle of the road and they were trying to get her not to drive.

. . . .

[Ms. Christy] run a couple of cars off the road, had her headlights off for a while, and then she made a U-turn. Me and my son pulled up beside her, rolled the window down and told her not to drive because she was drinking. Then she sped up and we pulled up beside her again and told her not to drive because she's been drinking and she sped up. The she started going lane-to-lane, and then the next time I went to pull up beside her, her bumper knocked the front bumper of my car and then had a wreck.

. . . .

So, I followed her and you know, we tried several times to pull up beside her, her son hollering at her and told her to pull over. She just pulled over and take back off again and then all this happened. Me and my son had seat belts on and it didn't hurt us.

Asked if he swerved his car over to hit Ms. Christy's truck, the Defendant-Appellant replied, "No, I tried to go up beside her and she was doing like that back and forth and when I got about right there, we made contact and then her vehicle disappeared. Me and my son didn't see what happened to it, it was just a cloud of smoke[.]" The Defendant-Appellant said that there were other vehicles present during the beginning and at the end of the chase.

The trial court granted the motion for judgment of acquittal as to the first degree murder charge and instructed the jury on second degree murder and its lesser included offenses. The jury returned guilty verdicts on voluntary manslaughter, vehicular homicide, aggravated assault, aggravated child neglect, and felony reckless endangerment. Following a sentencing hearing, the trial court merged the voluntary manslaughter conviction into the vehicular homicide conviction and sentenced the Defendant-Appellant to ten years' confinement as a Range I, standard offender for the aggravated child neglect conviction, to be served consecutively to all other counts. In regard to the remaining counts, the trial court

-4-

sentenced the Defendant-Appellant as a Range II, multiple offender to concurrent eight year terms of confinement for vehicular homicide and aggravated assault and three years' confinement for reckless endangerment with a deadly weapon involved. Accordingly, the Defendant-Appellant received an effective sentence of eighteen years.

The Defendant-Appellant filed a motion and amended motion for new trial, which we glean from the record were heard and denied. On October 12, 2011, Christy filed a timely notice of appeal. This appeal followed.

## ANALYSIS

On appeal Defendant-Appellant contends that the State failed to introduce any evidence to prove (1) that J.C.'s health and welfare were adversely affected by Defendant-Appellant's actions and (2) "a causal connection between the high speed chase and any adverse effect to the health and welfare of [J.C.]" The State responds that the evidence presented at trial was sufficient to sustain the conviction for aggravated child neglect beyond a reasonable doubt.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Aggravated child neglect, in relevant part, is defined as the knowing abuse or neglect of "a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare," T.C.A. § 39-15-401(b)(2006), while using a "deadly weapon, dangerous instrumentality or controlled substance . . . to accomplish the act of abuse, neglect or endangerment." T.C.A. § 39-15-402(3)(2006) (current version at § 39-15-402(2)(2010)). Therefore, in order to sustain the aggravated child neglect conviction in this case, the State was required to prove that the Defendant-Appellant knowingly neglected his son, J.C., who was under the age of eighteen, with the use of a deadly weapon, resulting in an adverse effect on J.C.'s health and welfare. See id., State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008) (interpreting T.C.A. § 39-15-401(a)). The Defendant-Appellant does not dispute that he acted knowingly[1] or that J.C. was under eighteen, but he contends "[t]he State did not

_____

[1] "[T]he offense of child abuse through neglect is a nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the
(continued...)

-6-

introduce any evidence that [J.C.'s] health and welfare were adversely affected due to the actions of [the Defendant-Appellant]." The Defendant-Appellant argues that "if the fact that the Defendant was found guilty in the death of his spouse, and that is the adverse effect to the health and welfare of [J.C.], then in every case where a spouse is found guilty of killing the other spouse, then a separate charge for Aggravated Child Neglect would lie if they had minor children. [The Defendant-Appellant] argues there must be some causal link to something more for this prong of the offense."

Analyzing the child neglect statute, the Tennessee Supreme Court noted that "the statute itself does not define the phrase 'so as to adversely affect the child's health and welfare,' nor does it specifically address whether this phrase requires proof of some actual detriment or harm before criminal liability may be imposed." State v. Mateyko, 53 S.W.3d 666, 669 (Tenn. 2001).[2] The court held "that some proof of an actual, deleterious effect upon the child's health and welfare must exist before a conviction may be sustained under Tennessee Code Annotated section 39-15-401(a)." Id. The court noted that "by further including the 'adverse effects' element in the statute, the General Assembly must have intended that the State show something more than a risk of harm to a child's health and welfare before it could subject a defendant to criminal liability under section 39-15-401(a)." Id. at 671. The Mateyko children were found in an "indescribably filthy" mobile home overrun with cockroaches. Id. at 668. The Mateyko Court summarized the conditions and effect on the children:

> Garbage and refuse were scattered throughout the home, and pungent odors of urine, old fried food, and human feces permeated every corner. . . . Despite living in these abhorrent conditions, however, the children appeared by all accounts to be in good health, and they did not exhibit any signs of illness or other affliction, except that one child was suffering from a cold. Their grandmother later testified that when the children first arrived at her house during the early morning hours of May 2, she believed them to be well-fed and "in perfect health."

---

[1](...continued)
defendant's conduct achieves." State v. Mateyko, 53 S.W.3d 666, 669 (Tenn. 2001) (citing State v. Ducker, 27 S.W.3d 889, 896-97 (Tenn. 2000)).

[2]Mateyko was decided prior to the 2005 amendments, which added subsection (b) to Tennessee Code Annotated, section 39-15-401. See State v. Deandre Blake, No. W2010-00468-CCA-R3-CD, 2011 WL 4433651, at *15 (Tenn. Crim. App., at Jackson, Sept. 23, 2011) (Tipton, P.J., concurring) (quoting 2005 Tenn. Pub. Acts ch. 487, §2), perm. app. denied (Tenn. Feb. 15, 2012) ("In the contemporaneous amendments to the aggravated child abuse statute, the legislature identified the first alternative as "child abuse" and the second alternative as "child neglect or endangerment.").

Id. The court concluded that "these vile conditions did produce a risk of harm to the children's health, but fortunately for these children, they were removed from that filthy environment before any harm actually occurred." Id. at 672. Therefore, Mateyko affirmed this Court's determination that the State had failed to prove child abuse through neglect. See id. at 677-78 (remanding "for a new trial on the lesser-included offense of attempted child abuse through neglect").

In State v. Winders, 1989 WL 105710, at *2 (Tenn. Crim. App. Sept. 14, 1989), decided prior to Mateyko, this Court concluded that the evidence was sufficient to support a conviction of child neglect against a man who abandoned several children at a convenience store for a short time early one morning. Testimony at trial included that of the children's maternal grandmother who found them "'upset, nervous, shookup [sic] as any children would be." Id. at *1. We further concluded that there was sufficient evidence of an adverse effect upon the emotional health and welfare of the children on the basis that they "were described as 'cold' and obviously suffering emotional distress from having been left in the dark at an unfamiliar place all alone." Id. at *2; see also State v. Jenson, No. M2003-02848-CCA-R3-CD, 2005 WL 1475311, at *5 (Tenn. Crim. App. June 21, 2005) (concluding that crack cocaine smoke in residence which made breathing difficult constituted sufficient evidence of adverse effect to the health and welfare of the child).

Contrary to the Defendant-Appellant's assertions, the record demonstrates a sufficient nexus between his actions and an adverse effect on the mental or emotional health and welfare of his son. In this case, the Defendant-Appellant drove his car at speeds exceeding one-hundred miles per hour with his eleven-year-old son in the car. Despite his son's pleas to stop the chase, the Defendant-Appellant continued this conduct for approximately eleven miles, even enlisting his son to yell out of the window at his mother. His son testified that he was "scared" because his father was driving "real fast" and that he knew "something was going to happen." The Defendant-Appellant struck his wife's truck not once, but twice, resulting in her being ejected from her truck and suffering major trauma throughout the upper part of her body, with blood coming out of her ears, nose, mouth. J.C. witnessed the high-speed chase, the impending crash, and the traumatic death of his mother. He stated he was "upset" following the crash, and the Defendant-Appellant had him removed from the scene before his police interview. Based on this evidence, and given the above authority, we conclude that a rational trier of fact could have found that the Defendant-Appellant's high speed chase in excess of one-hundred miles per hour and ultimate collision with Ms. Christy's truck had an adverse effect on the emotional and mental health and welfare of J.C. While far from overwhelming, we further conclude that J.C.'s testimony that he was in fact "scared" and "upset" following the crash was sufficient evidence to establish an adverse effect on his emotional and mental health and welfare. The Defendant-Appellant is not entitled to relief.

The Defendant-Appellant additionally argues that because he did not use the vehicle against J.C., the State failed to carry their burden of proof. However, we rejected this same argument in State v. Brandon R. Patrick, No. 03C01-9712-CC-00548, 1999 WL 84076 (Tenn. Crim. App. Feb. 19, 1999). As in the instant case, the defendant in Brandon R. Patrick argued "because the victim was inside the vehicle, the car was not a weapon aimed at the victim." Id. We stated that "[a]n automobile is not, under all circumstances, a deadly weapon; the method of use is the controlling factor that must be examined on a case-by-case basis." Id.; accord State v. Sides, 2008 WL 538983 (Tenn. Crim. App. 2008). Brandon R. Patrick concluded that the car was used as a deadly weapon for felony reckless endangerment:

> Clearly, there was proof that the defendant utilized the vehicle in a dangerous manner. The defendant drove nearly 40 m.p.h. over the speed limit in a residential area, disregarding red signals and stop signs. Officer Arnold testified that there were other cars on the roadway during the chase. Those circumstances establish that the defendant's manner of driving subjected the victim to risk of injury or death. That the victim claimed not to be frightened by the defendant's driving is immaterial. That is not an element of the offense.

Brandon R. Patrick, 1999 WL 84076, at *2.

We view this case no differently than Brandon R. Patrick. As previously noted, there is no question that the Defendant-Appellant was "driving at an outrageously excessive speed," on a dimly lit roadway at night. See e.g., State v. Saunders, No. E1998-00230-CCA-R3-CD, 2000 WL 739455, at *11 (Tenn. Crim. App. June 8, 2000) (Witt, J., dissenting). His son pleaded with him to stop out of fear of something bad might happen, but the Defendant-Appellant refused. As in Brandon R. Patrick, because the Defendant-Appellant utilized his car in such an outrageously dangerous fashion, his claim that his car was not a weapon aimed at his son, a passenger, is unavailing. Accordingly, the Defendant-Appellant is not entitled to relief on this issue.

## CONCLUSION

Upon a thorough review of the record and appropriate authority, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE